UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-765 PA |
|---|---|
| Plaintiff, | COURT'S FINDINGS OF FACT IN SUPPORT OF THE DENIAL OF DEFENDANT RIO YOUNG'S MOTION TO SUPPRESS |
| v. | |
| RIO YOUNG, | |
| Defendant. | |

Defendant Rio Young moved to suppress statements he made to United States Secret Service Agents. Young contends in his pre-trial motion to suppress that his statement resulted from a custodial interrogation and that he had not been read his <u>Miranda</u> rights. The government argues that the statements were voluntary and not the product of a custodial interrogation. On February 10, 2014, the Court held an evidentiary hearing on Young's motion to suppress.

After hearing testimony and argument, the Court denied the motion. Young then entered a conditional guilty plea. The Court submits its factual findings as follows:

1. On March 14, 2013, during the early morning hours, members of the Los Angeles Field Office Electronic Crimes Task Force arrived at Young's home in North Hills, California armed with a federal search warrant. Young, who was 20 years old at the

time, lived with his mother. The warrant authorized agents to search the residence for evidence of child pornography.

2. The search team was comprised of twelve law enforcement officers, including ten agents from the United States Secret Service ("USSS") and two investigators from the Los Angeles District Attorney's Office ("LADAO"). The agents wore jackets labeled "Secret Service." The two LADAO investigators may have worn jackets that identified them as being with LADAO. The agents were equipped with handguns, batons, ballistics vests, flashlights and radios. Not all twelve officers made the initial entry into the residence. The entry team consisted of five USSS agents.

3. At approximately 6:00 a.m., the entry team entered the front door of the residence. Secret Service Agent Neal Hayes knocked on the front door four times and then yelled "police, search warrant, open the door." When nobody answered, Agent Hayes repeated this same "knock and announce" sequence approximately five times. When no one answered the door, one of the agents forced the door open to gain entry into the residence.

4. When the agents made their initial entry into the residence there were no lights turned on. Agents Hays used his flashlight to illuminate the residence. Due to large amounts of clutter in the residence, the agents' movements were restricted. Shortly after making entry, agent Hays made contact with Young and his mother. He shined his flashlight and pointed his handgun at each and instructed them to keep their hands in the air and exit the residence. Both Young, who is over six feet tall and weighs well over two hundred pounds, and his mother were compliant and exited the residence without incident. As Young and his mother exited the residence they encountered Agent Jesse Rangel. Agent Rangel directed Young and his mother to stand on the public sidewalk facing away from the residence toward a parked car. Agent Rangel directed Young, who was in his underwear, to spread his legs and place his hands behind his back with his fingers interlaced. As was his practice, Agent Rangel then placed one hand on Young's interlaced fingers for approximately three minutes while other agents were conducting a protective sweep of the

residence. While the protective sweep was taking place, Agent Rangel told Young that he was not under arrest and that the officers were there to execute a search warrant. The protective sweep was completed in three to five minutes. Once the protective sweep was concluded, members of the search team holstered their weapons and did not display them again.

5. Young and his mother were allowed back in the residence at the conclusion of the protective sweep. The two walked back into the residence and sat on a couch in the living room. Young was handed a shirt and pants. While Young and his mother were seated on the couch, they were approached by Secret Service Agent Brandon Cecil. Agent Cecil explained to Young and his mother that they were not under arrest and that they were free to leave. They were cautioned that if they did leave, they would not be allowed to return until the search was completed. Agent Cecil then told them he wanted to talk with them individually to explain why the agents were there. Both Young and his mother agreed to speak with Agent Cecil.

6. During the execution of the search warrant, Young was seated on the couch in the living room with his mother while the agents searched the home. He was not handcuffed.

7. At the time of the search, agents were not familiar with Young, did not consider him a suspect and did not have any warrants for his arrest. They explained to Young that they wanted to speak with him about a computer in the home that was being used to download pornography.

8. Approximately five minutes later, Agent Cecil and LADA Investigator Britton Schaefer returned to the living room. Young voluntarily accompanied Agent Cecil and Investigator Schaefer to an attached garage where he voluntarily provided a statement. He was not handcuffed and again was advised that he was not under arrest and was free to leave. Young, Agent Cecil and Investigator Schaefer entered the garage and sat down. The garage was chosen for the interview because it was the only area of the residence where

three chairs could be placed comfortably. Photographs taken of the residence before the search confirm that the residence was covered in trash, clothing, and other items.

9. No other agents participated in the interview or even came inside the garage during the interview. The door leading from the garage to the kitchen was open during the interview. The garage door was also open a few feet. At no point during the interview did anyone stand in front of either door or block Young's path to the kitchen or the front yard.

10. Before the interview began, Agent Cecil again told Young that he was free to leave. He also told him that if at any point during the interview he wanted to leave, he was free to do so. Young was advised that the interview related to a computer in his home that was being used to download child pornography from the internet. During the interview, Young was asked questions about his background, experience with computers, and the internet. Approximately twelve minutes into the interview, Young, who was attending Pierce College, admitted that he was intimately familiar with computers. He was asked whether he knew anything about a computer in the home that was being used to download child pornography. Young admitted to possessing and receiving child pornography.

11. During the interview, neither Agent Cecil nor Investigator Schaefer displayed a weapon or made any physical contact with Young.

12. During the interview both Agent Cecil and Investigator Schaefer and Young spoke in a non-confrontational conversational tone. There was no yelling, or threats and no raised voices. The agents informed Young at least twice that he was not under arrest.

13. The interview lasted approximately 40 minutes and was recorded. During the interview, Young volunteered that he had downloaded pornography from his home computer. At the conclusion of Young's interview, agents interviewed his mother. The search team left Young's residence at approximately 7:20 a.m., or roughly eighty minutes after they entered.

14. Several months later, Agent Cecil requested that Young take a polygraph examination aimed at determining whether he had ever molested or sexually abused

-4-

children. Young agreed to take the polygraph examination. On September 6, 2013, Young took the polygraph examination. Before the examination, Young was given his Miranda warnings. He agreed to waive his rights and answer questions. Following the polygraph examination, Young admitted to molesting two of his younger siblings over a three year period.

15. Young was not placed under arrest at the conclusion of the search of his home, the interview in the garage, or the polygraph examination. Young left the garage at the conclusion of the interview and later at the conclusion of the polygraph examination without incident.

16. The parties dispute whether and how Young was restrained by Agent Rangel. Young contends that Rangel held one of his arms behind his back for fifteen to twenty minutes, while Rangel maintains that he had Young interlace his fingers behind his back and simply placed his hand on Young's interlaced fingers for three to five minutes during the protective sweep of the residence. The weight of the evidence establishes that Young was not handcuffed or physically restrained by having his arm twisted behind his back during the protective sweep. Agent Rangel testified that it was his routine practice to hold a detainee's interlaced fingers during protective sweeps and in other similar circumstances. The Court finds that Agent Rangel's version of the events to be credible and that he held Young's interlaced fingers behind his back for roughly three minutes.

17. The audiotape also showed that Young was not frightened or intimidated during the interview. Although Young was never advised of his Miranda rights during questioning, agents did not threaten or suggest to Young that he would be placed under arrest or prosecuted, nor did they brandish their weapons.

18. At the time of the interview, agents had no evidence against Young or reason to suspect that he was involved in downloading child pornography from the internet. There is no evidence that at any time the police intended to elicit any incriminating statements about any crime committed by Young. No physical intimidation or psychological pressure

or coercive tactics were employed by the agents during the protective sweep, the search of Young's home, or the subsequent interview. In assessing the length and location of the interview, Young's maturity, education, and physical and mental condition, the Court finds that the defendant's will was not overcome by the circumstances surrounding the giving of his statements.

19. The agents' testimony was credible and consistent with other evidence. The questions posed by the agents were not "reasonably likely to elicit an incriminating response" and therefore their questions did not constitute an interrogation, and under the circumstances did not equate to compulsion, subtle or otherwise. Moreover, the agents' testimony was consistent with and substantiated by the audio recording. Young's demeanor, as evidenced by the recording, displayed a willingness to talk with the agents.

20. Some of Young's testimony during the evidentiary hearing contradicted the declaration he provided in support of the motion to suppress. Young's testimony concerning the length of time his hands were held behind his back and how long he was held on the sidewalk was not credible. Young stated in his declaration that his hands were held behind his back for fifteen to twenty minutes and that he was held on the sidewalk for fifteen to twenty minutes. At the evidentiary hearing, Young stated that his hands were held behind his back for approximately five minutes and that he was held on the sidewalk for five to ten minutes. In summary, the Court finds that Young was not a credible witness.

21. As a procedural safeguard to protect a person's Fifth Amendment rights, Miranda warnings must be given prior to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). These warnings require the individual to be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. . ." Miranda, 440 U.S. at 479.

22. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. The objective test is whether a reasonable person in the defendant's position would not feel free to terminate the interrogation and leave. United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008).

23. In the custodial context, interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

24. An individual is in custody when he is formally arrested or when his freedom of action is deprived to "a degree associated with formal arrest." United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th Cir. 2005).

25. In determining whether an individual is in custody, the Court looks at all the circumstances surrounding the interrogation. See United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002). The relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. Custody exists for Miranda purposes if a reasonable person in that position would have felt he or she was not at liberty to terminate the interrogation and leave. The test is an objective one.

26. In considering the totality of the circumstances of the questioning, the Court considered the following factors, among others: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Kim, 292 F.3d at 974 (citing United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). In this case, the initial questioning took place in Young's home in familiar surroundings, near his family, and away from public view. Young voluntarily accompanied Agent Cecil to the garage for questioning. The language used by the agents was non-confrontational and non-threatening. Moreover, the

agents' version of the events, including the duration or length of the interview and the absence of pressure applied to detain Young was corroborated by the audiotape.

27. Having had the opportunity to hear the officers' testimony and observe their demeanor, this Court determined that the officers, including Agent Rangel's version of the events, were more credible than Young's version of the events.

28. Under the totality of the circumstances, the Court concludes that Young was not in custody, and a reasonable person in his position would have understood that he was speaking to the agents voluntarily and that he was free to stop talking to the agents and leave at any time. The Court finds that Young's decision to provide statements was voluntary, that is the product of a free and deliberate choice rather than result of intimidation, coercion or deception.

DATED: June 25, 2014

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE